IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Whelco Industrial, Ltd.,                                          Case No. 3:05CV7141

        Plaintiff

        v.                                                        ORDER

United States of America,

        Defendant

This is a quiet title action in which the plaintiff, Whelco Industrial, Inc. [Whelco] seeks to remove or invalidate several federal tax liens filed by the Internal Revenue Service in 2004 against assets acquired by Whelco from a company named Whitney Electric Corporation [Whitney] in 2003. At the time of the asset acquisition, Whitney was in receivership; the state court, at the request of the receiver, approved an Asset Purchase Agreement between Whelco and Whitney.

Whelco contends that the government's liens did not, have not, and cannot attach to its assets, and that it otherwise cannot be held accountable for Whitney's tax obligations. In making this argument Whelco relies on Ohio law relating to successor corporations.

The government principally claims that federal common law, not state law, controls the determination of whether Whelco is a successor to Whitney, so that Whelco is obligated for Whitney's tax liabilities. The government also claims that the transaction between Whelco and Whitney was fraudulent, and entered into to enable the company's business operations to continue without the encumbrance of the tax obligation. Finally, the government asserts that its notice of lien could not be undone by the state court receivership because it was not a party to that proceeding.

The case was tried without a jury. Following submission of post-trial briefs, the case is decisional.

For the reasons that follow, judgment shall be entered in favor of the government and against Whelco as to the successor corporation issue.[1]

**Background**

For several years Whitney repaired "electric motors, gear boxes, pumps, things that are used in heavy industry to create motion" in the Toledo, Ohio, and Fort Wayne, Indiana, areas. (Tr. at 113:2-4.) During the period pertinent to this suit, attorney Richard Farrar [Richard] was Whitney's sole owner and President.

National City Bank [National City] filed a financing statement perfecting its interest in Whitney's collateral on November 13, 2001. National City's lien extended to Whitney's accounts receivable, inventory, machinery, and equipment. Greenfield Commercial Credit, LLC [Greenfield], a factoring company, also filed a financing statement on March 13, 2002, thereby also perfecting its interest in Whitney's accounts and inventory.

On July 31, 2002, the IRS filed a notice of federal tax lien against Whitney for unpaid employment taxes for the fourth quarter of 2001 and first quarter of 2002; the first quarter 2002 obligation remains unpaid.

When the IRS filed its liens, Whitney owed National City, a first lien holder, upwards of $550,000. Greenfield concurrently had a lien on all of Whitney's accounts receivable.

---

[1] In light of my resolution of the successor corporation issue, it is not necessary to adjudicate the other matters in dispute between the parties.

In August, 2002, an attorney from National City spoke with Michael Farrar [Michael], Richard's son, who was active in Whitney's management, about whether Michael would be interested in purchasing Whitney's assets. Michael expressed interest in such a purpose and growing the business.

On September 30, 2002, Whitney ceased operations. Whelco, which Richard had incorporated shortly before that date, began operations on October 1, 2002. Michael was the President and owner of Whelco.

Also on October 1, 2002, Whelco entered into a lease with Whitney, whereby Whelco could use Whitney's machines, equipment, and other personal property. The lease imposed no obligation on Whelco to assume Whitney's debts or claim the proceeds of any of Whitney's uncollected accounts receivable. Whelco continued in essentially the same business as Whitney, and operated that business from the same premises and with the same employees. Though a new bank account was opened and other incidents of operation attendant on the change of identity were instituted, the business, in terms of where it was done, what was done, how it was done, why it was done, and who was doing it, remained substantially unaltered.

On October 11, 2002, National City filed a cognovit complaint in the Lucas County, Ohio, Court of Common Pleas against Whitney; the complaint asked the court to appoint a receiver for both Whitney and the 3607 Company, a real estate holding company [owned by Richard] which owned the building in which Whelco [and previously, Whitney] had its operations.

The Common Pleas Court entered cognovit judgment that day. It concurrently appointed attorney Ralph DeNune as receiver.

3

During the course of the receivership, DeNune had conversations with Gregory Yurich, an IRS representative. They discussed the possible sale of Whitney's assets and National City's lien priority. Though the IRS was not made and did not become a party to subsequent proceedings in the receivership action, it was aware of a potential sale of Whitney's assets.

Michael entered into an agreement on November 20, 2003, with DeNune to purchase Whitney's assets for $555,228.85. The price was set by National City. As a result of this transaction, National City's lien was discharged. In addition, Greenfield received $325,565.48 from Whitney's accounts receivable.[2]

To finance the purchase, Michael received a $150,000 loan from George Ballas.[3] He also obtained financing from Crestmark Bank, for which he provided his personal guarantee and mortgaged the family residence.

In the Asset Purchase Agreement Michael specifically declined to assume any of Whitney's obligations or liabilities.

The Court of Common Pleas approved the sale in January, 2004. The Motion Confirming Sale provides that the "assets were sold free and clear of all liens and encumbrances."

---

[2] About two percent [$11,487.16] of Whitney's accounts receivable wound up on Whelco's books. Whitney and Whelco had the same office manager/bookkeeper, who was the only office employee. Though paid by Whitney until it ceased operations and Whelco thereafter, she also served as secretary to Richard's law practice. According to her, the Whitney accounts receivable were "accidentally mixed in with the Whelco deposits or the customers would send in joint payments, some for Whitney and some for Whelco." (Tr. at 63).

[3] Without being conclusive, the evidence suggests that the Ballas loan was funneled through Richard, who is named as a payee on the loan document.

On January 14, 2004, the IRS filed further notices of federal tax liens against Whitney for unpaid employment tax liabilities and, as well, a notice of tax lien against Whelco as the alter ego/fraudulent transferee/nominee of Whitney. The IRS filed additional nominee liens against Whelco on April 14, 2004, April 27, 2004, and August 5, 2004. These led to the IRS's collection of upwards of $105,000 of Whelco's receivables.

In this quiet title action, which has been removed from the Lucas County Court of Common Pleas, Whelco seeks a declaration that the liens against its personal property are invalid; it asks that the liens presently pending against it be lifted.

## Discussion

The dispositive issue in this case is whether Whelco is a "continuation" of Whitney. Resolution of this issue depends on whether Ohio or federal common law applies.

If this determination is governed by Ohio law, Whelco is not Whitney's successor, and is not accountable for Whitney's tax obligations. In Ohio determination of whether a successor corporation is liable for a predecessor's obligations depends on "the continuation of the corporate entity, not the business operation, after the transaction." *Welco Industries, Inc. v. Applied Cos.*, 67 Ohio St.3d 344, 350 (1993) (citing *Flaugher v. Cone Automatic Mach. Co.*, 30 Ohio St.3d 60 (1987)).

The fact that the new corporation has "the same physical plant, officers, employees and product line as" the old corporation does not matter. *See id.* at 350. The test in Ohio is, rather, whether "'the *same people* own[] both corporations.'" *Id.* (citing *Turner v. Bituminous Cas. Co.*, 397 Mich. 406, 449 (1976)) (emphasis supplied).

5

Here, the same people do not own the prior and subsequent corporations. Michael owns Whelco; Richard owned Whitney. Even though the business and its operations are fundamentally the same, that does not matter under *Welco*.[4]

The federal common law, in contrast, applies a different test for determining whether a successor corporation is liable for the obligations of a predecessor. Rather than looking to the continuity of ownership, federal common law looks at continuity of operations: under federal common law, successor liability can be applied if the successor had notice of the potential claim before the acquisition and there is substantial continuity in the operation of the business before and after the sale. *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 748 (7th Cir. 1994). This "substantial continuity in the operation of the business" exists if "before and after the sale . . . no major changes are made in . . . operation." *Id.* (citing *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture*, 920 F.2d 1323, 1327 (7th Cir.1990); *EEOC v. Vucitech*, 842 F.2d 936, 944-45 (7th Cir.1988)).

Whelco was on notice of the tax liens before it took over the operations and, then, later, the assets of Whitney. Whelco's business remained the same as Whitney's. Thus, under the federal "substantial continuity of operations" test, Whelco can be held liable for the taxes owed by Whitney.

Arguing against this result, Whelco asserts that displacement of the father with the son as owner and manager was an operational change sufficient to break the chain of continuity. I disagree: as the government points out, a change in management is likely to be a commonplace occurrence with a change in ownership. Indeed, if the owner [and thus, in all likelihood, the management]

---

[4]

The decision in *Welco* being definitive and undisturbed by later Ohio Supreme Court decisions, it is binding on this Court, despite the government's effort to suggest that it does not mean what it says [namely, that successor liability under Ohio law depends on continuity of ownership] or otherwise should be disregarded.

6

remained the same, successor liability would follow even under the continuity of ownership test of *Welco*.

In this case, aside from Michael taking over as owner and as President in place of Richard, nothing else of any significance changed in the nature of the business or how it was conducted. Its "product" – the servicing of motors and pumps – general mode of operation, location, employees, and customers remained the same. The circumstances here clearly fit within the "continuity of operations" doctrine.

But that is only a preliminary determination. What matters is whether the federal "continuity of operations" or Ohio's "continuity of ownership" doctrine applies.

To apply federal common law in this case rather than the law of Ohio requires a specific showing of "a significant conflict between some federal policy or interest and the use of state law." *Mickowski v. Visi-Trak Worldwide, LLC*, 415 F.3d 501, 511 (6th Cir. 2005). The dispositive question in this case is, therefore, whether application of Ohio's continuity of ownership test would conflict significantly with "some federal policy and interest."

Taxes are the "lifeblood" of government, and "prompt and certain availability" of tax revenues is "an imperious need." *Bull v. U.S.*, 295 U.S. 247, 259 (1935). It cannot be doubted, as the Supreme Court has stated, that "[t]he Government has a strong interest in the 'prompt and certain collection of delinquent taxes.'" *Grable & Sons Metal Products, Inc. v. Darue Eng'g and Mfg.*, 545 U.S. 308, 315 (2005) (citing *U.S. v. Rodgers*, 461 U.S. 677, 709 (1983)).

In *Clearfield Trust Co. v. U.S.*, 318 U.S. 363, 366 (1943), the Supreme Court noted that, "[w]hen the United States disburses its funds or pays its debts, it is exercising a constitutional function or power" that is "in no way dependent on the laws of Pennsylvania or of any other state."

7

Collecting funds for later disbursement and payment of governmental obligations is equally an exercise of fundamental governmental power. The ability of the federal government to do so free of state restraint and unfettered by state laws is as essential to its well-being and well-ordered operation as is its ability to pay its debts. One cannot occur without the other.

Were Whelco to prevail in this case, a *federal* tax that could not, as a result of the operation of *state* law, be collected in one state could, nonetheless, be collected in another state. Collection barred by Ohio could, nonetheless, occur elsewhere in states which, as under federal common law, use a "continuity of operations" standard to determine successor liability.[5]

Tax collection unimpaired by inconsistent state doctrines is at least as important a federal interest as those interests that, according to other courts, justify the application of federal common law principles. *See U.S. v. Pisani*, 646 F.2d 83 (3rd Cir. 1981) (liability for Medicare overpayment); *Thomas v. Peacock*, 39 F.3d 493 (4th Cir. 1994), *rev'd on other grounds*, 516 U.S. 349, 353-54 (1996) (ERISA liability); *NLRB v. Greater Kans. City Roofing*, 2 F.3d 1047, 1051 (10th Cir. 1993) (federal labor dispute); *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1225 (3rd Cir. 1993) (CERCLA liability); *Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 25-26 (1st Cir. 2000) (Railway Labor Act); *U.S. v. Golden Acres, Inc.*, 702 F. Supp. 1097 (D.Del. 1988) (liability for violation of federal priority statute and default on a HUD mortgage).

In response to the government's argument about the applicability of federal common law, Whelco contends that under *Aquilino v. U.S.*, 363 U.S. 509 (1960), state, and not federal law

---

[5] One of these states is Ohio's neighbor Michigan, which uses the "continuity of operations" test. *See Turner, supra*, 397 Mich. at 411 (cause of action arises against a successor corporation "where the totality of the transaction demonstrates a basic continuity of the enterprise."). The ability of the federal government to collect a tax should not stop at the border between one state and another.

8

determines whether a taxpayer owns property or rights to property. Consequently, according to Whelco, this court must look only to state law to determine the issue of successor liability.

To be sure, the Court in *Aquilino* emphasized the role of state law in determining "whether and to what extent the taxpayer had 'property' or 'rights to property' to which the tax lien could attach." *Id*. at 512. But, of equal, if not greater importance for this case, the Court also stressed "the necessity for a uniform administration of the federal revenue statutes." *Id*. at 514.

This case does not involve a determination of Whelco's property rights – i.e., whether it owns the assets against which the liens have attached. It involves, rather, the issue of its liability for unpaid taxes which those liens seek to enforce. Arguably, if state law defines a taxpayer's property rights it should also define that taxpayer's liabilities. Yet, "[i]t is one thing to say that a taxpayer's property rights have been and should be created by state law. It is quite another thing to declare that in the interest of efficient tax administration one must look to federal law to resolve" whether a corporation is a successor for the purposes of federal tax liability. *Id.* at 514 n.5. Just as it is appropriate for federal law to govern the priority of competing liens – a judgment that definitely affects property rights – it is equally appropriate for federal law to determine whether a corporation is a successor to another corporation for the purposes of federal tax liability. *See id*. at 513-14.

To make that determination, which involves a choice between state and federal law, depends on whether, as discussed above, there is a significant conflict with a federal interest. That interest – the "uniform administration of the federal revenue statutes" – must prevail over a state doctrine that would prevent consistent and universal collection of taxes throughout our federal Republic.

**Conclusion**

For the foregoing reasons, I conclude that Whelco is liable as a successor corporation for Whitney's unpaid and past due tax obligations. The overriding federal interest favoring uniform application and consistent enforcement of the federal tax laws not merely justifies, it compels application of federal common law principles in this case.

It is, accordingly,

ORDERED THAT judgment be, and the same hereby is entered in favor of the defendant United States of America and against the plaintiff Whelco Industries, Ltd.

So ordered.

s/James G. Carr<br>
James G. Carr<br>
Chief Judge