IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Whelco Industrial, Ltd.,                              Case No: 3:05CV7141

         Plaintiff,

        v.                                                 ORDER

United States of America,

         Defendant

This is a quiet title action in which the plaintiff, Whelco Industrial, Inc. [Whelco] seeks to remove or invalidate several federal tax liens filed by the Internal Revenue Service. Whelco contends that the government's liens did not, have not, and cannot attach to its assets, and that it otherwise cannot be held accountable for the Whitney Electric Corporation's [Whitney] tax obligations. In making this argument Whelco has relied on Ohio law relating to successor corporations.

In response, the government principally claims that federal common law, not state law, controls the determination of whether Whelco is a successor to Whitney. As such, Whelco is responsible for Whitney's tax liabilities. The government also asserts that its notice of liens against Whitney could not be undone by a state court receivership because it was not a party to that proceeding.

I tried the case without a jury. Following submission of post-trial briefs, I found for the government [Doc. 39]. I based my decision, in which I accepted the government's assertion that

federal common law rather that Ohio law controlled, in considerable part on my understanding of the importance of a uniformly operating system of federal tax collection.

Whelco has filed a motion to alter or amend the judgment and stay this court's execution of the judgment [Docs. 41, 42]. In its motion to alter or amend, Whelco focuses primarily on precedents in which courts: 1) held that state law controlled issues related to quiet title actions, and 2) rejected uniformity as a significant policy interest warranting creation of federal common law.

For the reasons that follow, I grant plaintiff's motion to alter or amend. Nonetheless, reaching an issue that I did not have to reach in my earlier decision, I decide that issue in favor of the government and thus confirm entry of judgment in its favor.

**Background**

For several years Whitney repaired "electric motors, gear boxes, pumps, things that are used in heavy industry to create motion" in the Toledo, Ohio, and Fort Wayne, Indiana, areas. (Tr. at 113:2-4.) During the period pertinent to this suit, attorney Richard Farrar [Richard] was Whitney's sole owner and President.

National City Bank [National City] filed a financing statement perfecting its interest in Whitney's collateral on November 13, 2001. National City's lien extended to Whitney's accounts receivable, inventory, machinery, and equipment. Greenfield Commercial Credit, LLC [Greenfield], a factoring company, also filed a financing statement on March 13, 2002, thereby also perfecting its interest in Whitney's accounts and inventory.

On July 31, 2002, the IRS filed a notice of federal tax lien against Whitney for unpaid employment taxes for the fourth quarter of 2001 and first quarter of 2002; the first quarter of 2002 obligation remains unpaid. Additional notices followed on December 18, 2002, February 18, 2003,

and January 20, 2004. When the IRS filed its liens, Whitney owed National City, a first lien holder, upwards of $550,000. Greenfield concurrently had a lien on all of Whitney's accounts receivable.

In August, 2002, an attorney from National City spoke with Michael Farrar [Michael], Richard's son, who was active in Whitney's management, about whether Michael would be interested in purchasing Whitney's assets. Michael expressed interest in such a purpose and in growing the business.

On September 30, 2002, Whitney ceased operations. Whelco, which Richard had incorporated shortly before that date, began operations on October 1, 2002. Michael was the President and owner of Whelco.

Also on October 1, 2002, Whelco entered into a lease with Whitney, whereby Whelco could use Whitney's machines, equipment, and other personal property. The lease imposed no obligation on Whelco to assume Whitney's debts or claim the proceeds of any of Whitney's uncollected accounts receivable. Whelco continued in essentially the same business as Whitney, and operated that business from the same premises and with the same employees. Though Michael opened a new bank account and instituted other changes, the business, in terms of where it was done, what was done, how it was done, why it was done, and who was doing it, remained substantially unaltered.

On October 11, 2002, National City filed a cognovit complaint in the Lucas County, Ohio, Court of Common Pleas against Whitney; the complaint asked the court to appoint a receiver for both Whitney and the 3607 Company, a real estate holding company (owned by Richard) which owned the building in which Whelco (and previously, Whitney) had its operations.

The Common Pleas Court entered cognovit judgment that day. It concurrently appointed attorney Ralph DeNune as receiver.

3

During the course of the receivership, DeNune had conversations with Gregory Yurich, an IRS representative. They discussed the possible sale of Whitney's assets and National City's lien priority. Though the IRS was not made and did not become a party to subsequent proceedings in the receivership action, it was aware of a potential sale of Whitney's assets.

On November 20, 2003, Michael entered into an agreement with DeNune to purchase Whitney's assets for $555,228.85. The price was set by National City. As a result of this transaction, National City's lien was discharged. In addition, Greenfield received $325,565.48 from Whitney's accounts receivable.[1]

To finance the purchase, Michael received a $150,000 loan from George Ballas.[2] He also obtained financing from Crestmark Bank, for which he provided his personal guarantee and mortgaged the family residence. In the Asset Purchase Agreement, Michael specifically declined to assume any of Whitney's obligations or liabilities.

The Court of Common Pleas approved the sale in January, 2004. The Motion Confirming Sale provides that the "assets were sold free and clear of all liens and encumbrances."

On April 14, 2004, the IRS filed two notices of federal tax liens against Whelco as the alter ego/fraudulent transferee/nominee of Whitney. The IRS filed additional nominee liens against

---

[1] About two percent ($11,487.16) of Whitney's accounts receivable wound up on Whelco's books. Whitney and Whelco had the same office manager/bookkeeper, who was the only office employee. Though initially paid by Whitney, and Whelco thereafter, she also served as secretary to Richard's law practice. According to her, the Whitney accounts receivable were "accidentally mixed in with the Whelco deposits or the customers would send in joint payments, some for an old Whitney invoice, and some for a new Whelco invoice." (Tr. at 63: 18-20.)

[2] Without being conclusive, the evidence suggests that the Ballas loan was funneled through Richard, who is named as a payee on the loan document.

4

Whelco on April 27, 2004 and August 5, 2004. These led to the Service's collection of upwards of $105,000 of Whelco's receivables.

In response to these actions, Whelco brought a quiet title action, which the government removed from the Lucas County Court of Common Pleas to this court. Whelco sought a declaration that the tax liens against Whitney could not attach to the assets Whelco purchased at the receivership sale, while the government aimed to show that Whelco was Whitney's successor/alter ego and as such was responsible for its unpaid taxes.

Following a nonjury trial and post-trial briefing, I entered judgment in favor of the United States. Because inconsistent state laws could lead to different collection outcomes in different states, I held that the federal "continuity of operations" test – rather than Ohio's "continuity of ownership" test – controlled. As a result, I held that the defendant's knowledge of the government's potential claim, coupled with the substantial continuity of the business's operations before and after the sale, made Whelco a successor to Whitney for the purposes of Whitney's tax liability. *Whelco Indus., Ltd. v. U.S.*, 503 F. Supp. 2d 906 (N.D. Ohio 2007).

On September 13, 2007, plaintiff filed its pending motion to alter or amend judgment and stay execution of the judgment. Although I conclude that plaintiff is correct that state law, not federal law, controls, I also conclude that the government correctly argues that its notice of liens against Whitney could not be undone by the state court receivership. Not having had to address that issue in my first opinion, I again find for the government and hold that the liens on assets formerly owned by Whitney remain in effect.

## Discussion

Three situations justify altering or amending a judgment under Rule 59(e): "(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005). A party must file a 59(e) motion within ten days of the court issuing its judgment. *Id.* at 611.; Fed. R. Civ. Pro. 59(e).

Nine days after I issued my order denying Whelco's motion to quiet title, Whelco submitted the instant motion arguing that a clear error of law or a manifest injustice would result if I enforced the aforementioned order. Employing a slight change in tactics, Whelco now argues that, because state law often controls actions to quiet title pursuant to 28 U.S.C. § 2410, state law should wholly control this case and that uniformity cannot justify the application of federal common law.

### 1. Application of State Law or Federal Common Law

### A. Lien Cases

Part of Whelco's new arguments focuses on lien cases. The plaintiff now points to numerous situations in which state law decides whether the court should quiet title under 28 U.S.C. § 2410. First and foremost, plaintiff relies on the Supreme Court's decision in *U.S. v. Brosnan*, 363 U.S. 237 (1960). In that case, the Court held that state law governed the divestiture of federal tax liens, explaining that "the need for uniformity in this instance is outweighed by the severe dislocation to local property relationships which would result from our disregarding state procedures." *Id.* at 242.

This holding, however, does not control the current case because the state law in question here does not directly define property rights. Rather, the conflicting laws in this case deal with Whelco's status as a successor corporation. Whelco does not point to a state procedure that extinguished the liens that the government imposed on its property, and the corporation's status as

6

a successor to Whitney does not implicate "an area of complex property relationships long since settled and regulated by state law."[3] *Id.* at 242.

The plaintiff also points to the Sixth Circuit's holding in *Spotts v. United States*, 429 F.3d 248 (6th Cir. 2005). In *Spotts*, the appellate court looked to state property law to decide whether a delinquent taxpayer had a property interest in the home owned by his wife. *Id.* at 251. Only if the husband had an interest under state law could the United States rightfully maintain its lien on the property. Whelco argues that because state law determines whether a party is a nominee for the purposes of property ownership, state law should also determine whether a party is a successor for the purposes of tax liability.[4]

In contrast to *Spotts*, however, the IRS targets Whelco as a successor to Whitney – not as a constructive trustee for property actually owned by Whitney. If state law defines a party's role as a nominee it arguably should also define the party's role as a successor. *See Whelco Indus., Ltd. v. U.S.*, 503 F. Supp. 2d 906, 911 (N.D. Ohio 2007). However, the motivation for the holding in *Spotts* – and the other cases Whelco cites – is a concern for the primacy of state law's role in deciding

---

[3] I deal with the effect of the state receivership proceedings on the liens that the government placed on the assets before Whelco purchased them (the liens on Whitney's assets) in Section Two.

[4] The impact of *Spotts v. U.S.*, 429 F.3d 248 (6th Cir. 2005), is similar to the impact of the Court's holding in *Aquilino v. U.S.*, 363 U.S. 509 (1960), a case on which the plaintiff relied in its previous motion. *Aquilino*, along with *U.S. v. Bess*, 357 U.S. 51 (1958), established that state law determines the ownership of property for the purposes of tax liens. *See Id.* at 55-56 (holding that a life insurance policy, and the state laws that enforced it, defined what the insured possessed as property and therefore what the government could attach); *Aquilino*, *supra*, 363 U.S. at 512-13 (holding that "federal and state courts must look to state law" when deciding whether a taxpayer has "'property' or 'rights to property' to which the tax lien could attach").

property questions.[5] *See Brosnan*, *supra*, 363 U.S. at 241-42 (property relationships "long since settled and regulated by state law"); *Aquilino*, *supra*, 363 U.S. at 512-13 ("state law controls in determining the nature of the legal interest which the taxpayer had in the property")*; Spotts*, *supra*, 429 F.3d at 251 (citing *Drye v. U.S.*, 528 U.S. 49, 58 (1999); *U.S. v. Nat'l Bank of Commerce*, 472 U.S. 713, 722 (1985)). This issue is not a concern in the case at bar; no one questions Whelco's ownership of the property subject to the liens. As a result, *Spotts*' reliance on Kentucky's constructive trust law and Brosnan's concerns for "local property relationships" should not control this court. *Spotts*, *supra*, 429 F.3d at 251-53; *Brosnan*, *supra*, 363 U.S. at 242.[6]

---

[5] If I framed the question as whether Whelco owns Whitney's federal tax liabilities, the reasoning in *Aquilino* and *Spotts* might be more applicable; extending the rationale in those decisions could provide that state law, and not federal common law, defines the ownership of property *and* unrelated liabilities. However, such an interpretation would allow state law to directly dictate the application of federal tax liability, a consequence which I do not believe the Sixth Circuit would endorse. *Cf. Harrell v. U.S.*, 13 F.3d 232, 234 (7th Cir. 1993) (explaining that if the plaintiff taxpayer is concerned with the tax assessment, rather than the levy that the IRS placed against his wages in an effort to collect those taxes, "[h]is remedy is to challenge the assessment in the Tax Court."); *Robinson v. U.S.*, 920 F.2d 1157, 1159 (3d Cir. 1990) ("Recognizing that Congress has provided an elaborate system for litigating tax claims in the Tax Court before payment and in District Court and the Court of Claims for refunds, courts have hesitated to add to the remedies provided by the Internal Revenue Code.").

[6] Furthermore, two recent cases at the Supreme Court distinguish between the assessment of property rights under state law and the secondary assessment of whether those rights constitute "'property' or 'rights to property' to which a federal tax lien may attach." *U.S. v. Craft*, 535 U.S. 274, 276 (2002) (reversing the Sixth Circuit and holding that despite the fiction that "a tenant by the entirety has no separate interest in entireties property . . . . [E]ach tenant possesses individual rights in the estate sufficient to constitute 'property' or 'rights to property' for the purposes of the lien"); *see also Drye v. U.S.*, 528 U.S. 49 (1999) (holding that defendant's disclaiming of inheritance according to state law did not defeat federal tax liens).

Thus, I am not persuaded by Whelco's arguments that the aforementioned precedents control and that any alternative outcome would be a "clear error" or "manifest injustice." *Intera Corp.*, *supra*, 428 F.3d at 620.

### B. Uniformity

There is no disagreement that the application of federal common law requires a "a significant conflict between some federal policy or interest and the use of state law." *Mickowski v. Visi-Trak Worldwide, LLC*, 415 F.3d 501, 511 (6th Cir. 2005) (citing *Atherton v. FDIC*, 519 U.S. 213, 218 (1997)). The plaintiff, however, now claims that uniformity of federal tax law does not constitute a "federal policy or interest" that justifies the application of a federal common law. The plaintiff's arguments persuade me that federal common law should not apply in this case and that the court should apply Ohio's "continuity of ownership" test when assessing successor liability for the purposes of federal tax obligations.

In my previous decision, I held that the federal government's interest in tax collection unimpaired by inconsistent state doctrines met the Sixth Circuits *Mickowski* requirement. In reaction, Whelco now cites to several opinions holding that an interest in uniformity does not justify the application of federal common law.[7] *See, e.g.*, *U.S. v. Kimbell Foods, Inc.*, 440 U.S. 715, 728

---

[7]

With regard to it first raising these arguments in its motion to alter or amend, Whelco claims that"[t]he United States did not argue this concept of 'uniformity' in either of its post-trial briefs, nor did it cite any case law in support of this inapplicable doctrine." (Mot. to Alter or Am., Sept. 13, 2007, at 9 n.2.)

This is not accurate. The government cited several cases which held that the uniform application of federal law justified the application of federal common law. (*See* Reply to Pl.'s Resp. Br., Aug. 2, 2007, at 2 n.1.) While the government may not have explicitly argued that uniformity required the application of federal common law, these cases should have put the plaintiff on notice that conflicts with state law usually implicate uniformity arguments. *See Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 26 (1st Cir. 2000) ("If the federal statute in question demands

9

(1979) (uniformity does not justify federal rules of lien priority with regard to certain lending programs); *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994) (uniformity does not justify federal common law regarding imputation of knowledge to the FDIC as receiver); *Marsh v. Rosenbloom*, 499 F.3d 165 (2d Cir. 2007) (uniformity does no justify federal common law based on equitable trust fund doctrine); *Faith Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 11 (2d Cir. 1996)

---

national uniformity, federal common law provides the determinative rules of decision."); *Lansford-Coaldale Joint Water Auth. v. Tonolli*, 4 F.3d 1209, 1225 (3d Cir. 1993) ("In addition, given the federal interest in uniformity in the application of CERCLA, it is federal common law, and not state law, which governs when corporate veil-piercing is justified under CERCLA."); *U.S. v. Pisani*, 646 F.2d 83, 86 (3d Cir. 1981) (explaining that the goals of the Medicare program "make[] a uniform federal rule desirable"); *U.S. v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988) ("In order to ensure the promotion of the federal objectives of the NHA and uniform enforcement of HUD-held loan agreements, the federal alter ego standard must govern . . .").

The issue of uniformity in the application of federal law (and its connection to the issue of state law conflicting with federal law) is also prominent in many of the cases Whelco cited in its original briefs. *See, e.g.*, *Mickowski*, *supra*, 415 F.3d at 512. This factor alone should have alerted the plaintiff to this important issue. Whelco's present effort to remedy its failure to raise arguments against uniformity in no way diminishes the consequences of Whelco's failure in its initial post-trial briefs to make the arguments it makes now or cite many of the cases on which it now relies.

Due to Whelco's failure to have made its present arguments when they should have been made, in its post-trial briefs, a substantial amount of my time has been wasted by the need to return to this case, review my earlier decision, and research the law anew. Candidly, I am tempted to impose sanctions on Whelco's counsel for their failure to have done the job it should have done the first time, rather than doing it only after it was not happy with the job that I did. To the extent that that job was done inadequately, the fault lies with Whelco's counsel. Thus, sanctions for the resulting waste of my time would be appropriate.

Rather than impose monetary sanctions, I will assume that the reprimand communicated in these comments suffices to put counsel in this case – and all counsel appearing in this court – on notice that failing to do the job right the first time is not the kind of lawyering that this court finds, or any court should find, acceptable. I assume, in any event, that Whelco's counsel have not billed their client for the extra time they have spent as a result of the need, due to their inadequate performance at the outset, to file the pending motion.

(uniformity does not justify a federal rule governing damages in cases arising under the Warsaw Convention).

Another factor that persuades me to alter my previous decision reflects an oversight by both litigants. In support of its arguments, the government cited several cases in which other federal courts have applied federal common law. While persuasive, many of these decisions were isolated to specific areas of law. For example, in the context of a labor dispute, federal common law, not state law, dictates "[w]hether a company or individual is responsible for the financial obligations of another company or individual." *N.L.R.B. v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 335 (6th Cir. 1990) ("Although state law cases may provide guidance in fashioning the content of federal law, they are not binding and thus do not control the outcome of this case."); *see also Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 (1957) (holding that when Congress passed §301(a) it "adopted a policy which placed sanctions behind agreements to arbitrate grievance disputes, by implication rejecting the common-law rule" and requiring courts to fashion federal law from national labor policy). In a case interpreting the Employee Retirement Income Security Act (ERISA), the Third Circuit similarly held that the statute "preempts any state law of veil piercing" therefore requiring the creation of federal common law. *Thomas v. Peacock*, 39 F.3d 493, 503 (4th Cir. 1994), *rev'd on other grounds*, 516 U.S. 349, 353-54.

Sixth Circuit decisions interpreting the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), also persuade me that I may have been mistaken in holding that federal common law, rather than state law, should dictate successor liability. Other circuits, including the Third, *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 92 (3d Cir. 1988), Fourth, *U.S. v. Carolina Transformer Co.*, 978 F.2d 832, 838 (4th Cir. 1992),

11

Seventh, *N. Shore Gas Co. v. Salomon, Inc.*, 152 F.3d 642, 654 (7th Cir. 1998), and Eighth, *U.S. v. Mex. Feed & Seed Co.*, 980 F.2d 478, 487 n.9 (8th Cir. 1992), have endorsed the application of federal common law to decide successor liability in CERLCA cases.

The Sixth Circuit, however, is not among those circuits. Instead, our Circuit has held that "the liability of a successor corporation for CERCLA obligations is determined by reference to state corporation law, rather than federal common law."[8] *City Mgmt. Corp. v. U.S. Chem. Co., Inc.*, 43 F.3d 244, 250 (6th Cir. 1994); *see also Anspec Co., Inc. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1248-51 (6th Cir. 1991).[9]

---

[8]

It is also essential to note that the Sixth Circuit does not agree with other courts' holdings that federal common law governs corporate veil piercing in CERCLA cases. *Compare U.S. v. Cordova Chem. Co. of Mich.*, 113 F.3d 572, 582 (6th Cir. 1997), *rev'd sub nom. on other grounds*, *U.S. v. Bestfoods*, 524 U.S. 51 (1998) ("The district court appropriately looked to Michigan law to determine whether to pierce the corporate veil"), *with Lansford-Coaldale Joint Water Auth. v. Tonolli*, 4 F.3d 1209, 1225 (3d Cir. 1993) ("In addition, given the federal interest in uniformity in the application of CERCLA, it is federal common law, and not state law, which governs when corporate veil-piercing is justified under CERCLA."). Despite the government's frequent citations to *Lansford-Coaldale*, Sixth Circuit precedent instructs that state law is dispositive on this issue. *See Bestfoods v. Aerojet-General Corp.*, 173 F. Supp. 2d 729, 747 (6th Cir. 2001) (pointing out that the Supreme Court noted disagreements among courts on veil piercing in CERCLA cases but "[b]ecause neither party appealed the Sixth Circuit's holding on derivative liability, the Sixth Circuit's holding remains binding") (citing *U.S. v. Bestfoods*, 524 U.S. 51, 64 n.9 (1998)).

[9]

Though the Sixth Circuit's primary *Anspec* decision made little of its application of state law, Judge Kennedy's concurrence explained why she believed Michigan law, rather than federal common law, decided the successor liability issue:

> It is true that the United States has some interest in this area, since in some cases it may be possible that only application of vicarious liability will allow recovery of response costs. It is also true that states may differ amongst themselves in some respects in this area. However, without a showing that state law is inadequate to achieve the federal interest, "we discern no imperative need to develop a general body of federal common law to decide cases such as this."

*Anspec Co., Inc. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1249 (6th Cir. 1991) (quoting *Wilson v.*

There are countervailing arguments that support applying federal common law. None of the cases applying state law relate to taxation, a government function on which all other federal functions rely. *See*, *e.g.*, *Grable & Sons Metal Prods., Inc. v. Darue Eng'g and Mfg.*, 545 U.S. 308, 315 (2005); *Bull v. U.S.*, 295 U.S. 247, 259 (1935) ("But taxes are the lifeblood of government, and their prompt and certain availability an imperious need."). Furthermore, in an effort to attain uniformity in particular circumstances, courts *have* applied federal common law. *See supra*, n. 7. In fact, the very case on which Whelco relies to argue that uniformity of the law can never constitute a conflicting federal policy or interest, also explains that "federal programs that 'by their nature are and must be uniform in character throughout the Nation'" would undoubtedly "necessitate formulation of controlling federal rules." *U.S. v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979).[10]

---

*Omaha Indian Tribe*, 442 U.S. 653, 673 (1979)).

[10] The *Kimbell* opinion also reminded readers that the "Court has consistently held that federal law governs questions involving the rights of the United States arising under nationwide federal programs." *U.S. v. Kimbell Foods, Inc.*, 440 U.S. 715, 726 (1979). In that case, the Court felt that state law could be incorporated as federal law because there was "little need for a nationally uniform body of law" to administer SBA and FHA loan programs. *Id*. at 728. But as with other portions of *Kimbell*, this holding was specific to the SBA and FHA loan context. For example, later in the decision, the Court explained that:

> Because SBA operations were "specifically and in great detail adapted to state law," the federal interest in supplanting "important and carefully evolved state arrangements designed to serve multiple purposes" was minimal. Our conclusion that compliance with state law would produce no hardship on the agency was also based on the SBA's practice of "individually negotiat[ing] in painfully particularized detail" each loan transaction. These observations apply with equal force here and compel us again to reject generalized pleas for uniformity as substitutes for concrete evidence that adopting state law would adversely affect administration of the federal programs.

*Id.* at 729-30 (internal citations omitted).

13

Enforcement of the federal tax code is arguably such a program. However, recent decisions diminishing the relevance of uniformity, in combination with our Circuit's decisions regarding successor liability in the CERCLA context, persuade me that this is not the case.

Therefore, I alter my preceding opinion and hold that Ohio's "continuity of ownership" test should apply to decide whether Whelco is successor to Whitney for the purposes of federal tax obligations. For the reasons outlined in my previous opinion, I also find that under the "continuity of ownership" test Whelco is not a successor to Whitney and cannot be held liable for Whitney's debts to the United States.[11]

### 2. Receivership Action

Alteration of my previous decision makes it necessary for me to adjudicate the other issues raised by this case: namely whether the tax liens the government placed on property owned by Whitney and purchased by Whelco at the receivership sale remain because the government was not joined as a party to the receivership action. I hold that the liens remain on the assets based on 26 U.S.C. § 7425(a).

---

[11] In its August 2, 2007 brief, the government made two arguments for application of successor liability under Ohio law. First, it argued that Whelco could be deemed a successor under Ohio law because "[t]he economics of the deal demonstrate that Richard retains a degree of influence over Whelco that is sufficient for the imposition of successor liability on Whelco, even though the two companies are technically owned by father and son." (U.S.'s Reply to Pl.'s Post Trial Resp. Br., Aug. 2, 2007, at 7.) Second, it claimed that "an analysis of the substance of the transaction" could lead me to find that Whelco purchased Whitney's assets for the fraudulent purpose of avoiding Whitney's employment tax debts. (*Id.* at 7 n.2.) I reject both of these arguments; the government provides little legal precedent and even less in the way of factual evidence to support them.

Pursuant to 26 U.S.C. § 6321, "[i]f any person liable to pay any tax neglects or refuses to pay the same after demand," the amount owed "shall be a lien in favor of the United States upon all property and rights to property" of such person. Meanwhile, 26 U.S.C. § 7425(a) provides in part:

> If the United States is not joined as a party, a judgment in any civil action or suit described in subsection (a) of section 2410 of title 28 of the United States Code, or a judicial sale pursuant to such a judgment, with respect to property on which the United States has or claims a lien under the provisions of this title--(1) shall be made subject to and without disturbing the lien of the United States, if notice of such lien has been filed in the place provided by law for such filing at the time such action or suit is commenced.[12]

An action to foreclose a mortgage or other lien on property is one of the actions identified by 28 U.S.C. § 2410. 28 U.S.C. § 2410(a)(2).

---

[12] In its entirety 26 U.S.C. §7425(a) reads:

> (a) Judicial proceedings.--If the United States is not joined as a party, a judgment in any civil action or suit described in subsection (a) of section 2410 of title 28 of the United States Code, or a judicial sale pursuant to such a judgment, with respect to property on which the United States has or claims a lien under the provisions of this title--
>
> (1) shall be made subject to and without disturbing the lien of the United States, if notice of such lien has been filed in the place provided by law for such filing at the time such action or suit is commenced, or
>
> (2) shall have the same effect with respect to the discharge or divestment of such lien of the United States as may be provided with respect to such matters by the local law of the place where such property is situated, if no notice of such lien has been filed in the place provided by law for such filing at the time such action or suit is commenced or if the law makes no provision for such filing.
>
> If a judicial sale of property pursuant to a judgment in any civil action or suit to which the United States is not a party discharges a lien of the United States arising under the provisions of this title, the United States may claim, with the same priority as its lien had against the property sold, the proceeds (exclusive of costs) of such sale at any time before the distribution of such proceeds is ordered.

As previously noted, the IRS filed its first notice of federal tax lien with respect to the unpaid Whitney employment-tax liabilities on July 31, 2002, several months before Whitney shut its doors and the bank began receivership proceedings. The IRS filed additional notices of federal tax liens on December 18, 2002, February 18, 2003 and January 20, 2004.[13] The assets on which the government imposed the liens include equipment Whelco uses in its day-to-day operations and the rights to the trade name and customer lists that Whelco purchased.

Whelco points out that certain creditors – namely, National City and Greenfield – had liens superior to the IRS's liens. While that may be so, the fact remains that the government's junior liens remain undisturbed. *See, e.g.*, *U.S. v. Winterburn*, 749 F.2d 1283, 1286 (9th Cir. 1984) ("If [the previous action was to quiet title] the tax liens were not extinguished by the state court's judgment because the government was not named as a party to that action"); *U.S. v. McNeil*, 661 F. Supp. 28, 30 (E.D. Ky. 1987) (holding that because the U.S. was not properly joined to the judicial proceeding, the government's liens remained after the related sale); *Myers v. U.S.*, 483 F. Supp. 1154, 1158 (W.D. La.1980) ("If a foreclosing creditor does not comply with the statute either by failing to join the government as a party or by failing to give the requisite notice, as the case may require, inferior tax liens will not be discharged by the foreclosure sale, but will follow the property into the hands of a third party.").

Whelco also suggests that the government's knowledge of the receivership proceeding in some way substitutes for joining the United States as a party. But the government's knowledge of

---

[13] Even under 26 U.S.C. § 7425(a), the last of these liens – filed on January 20, 2004 – cannot remain with the property after Whelco purchased it because "notice of such lien" could not have been filed at the time that the relevant parties commenced the "action or suit" to sell Whitney's assets to Whelco. 26 U.S.C. § 7425(a)(1).

the receivership cannot undermine 26 U.S.C. § 7425. Even if I deemed the sale of Whitney's property a "non-judicial sale" – implicating a mere notification requirement under 26 U.S.C. § 7425(b)[14] – the government's actual knowledge of the sale would not meet the notification standards of 26 U.S.C. § 7425(c).[15] *See, e.g.*, *RIMCO Acquisition Co. v. Johnson*, 68 F. Supp. 2d 793, 796-97

---

[14] In its entirety 26 U.S.C. §7425(b) reads:

> (b) Other sales.--Notwithstanding subsection (a) a sale of property on which the United States has or claims a lien, or a title derived from enforcement of a lien, under the provisions of this title, made pursuant to an instrument creating a lien on such property, pursuant to a confession of judgment on the obligation secured by such an instrument, or pursuant to a nonjudicial sale under a statutory lien on such property--
>
> (1) shall, except as otherwise provided, be made subject to and without disturbing such lien or title, if notice of such lien was filed or such title recorded in the place provided by law for such filing or recording more than 30 days before such sale and the United States is not given notice of such sale in the manner prescribed in subsection (c)(1); or
>
> (2) shall have the same effect with respect to the discharge or divestment of such lien or such title of the United States, as may be provided with respect to such matters by the local law of the place where such property is situated, if--
>
> (A) notice of such lien or such title was not filed or recorded in the place provided by law for such filing more than 30 days before such sale,
>
> (B) the law makes no provision for such filing, or
>
> (C) notice of such sale is given in the manner prescribed in subsection (c)(1).

[15] The relevant portions of 26 U.S.C. §7425(c) read:

> (c) Special rules.--
>
> (1) Notice of sale.--Notice of a sale to which subsection (b) applies shall be given (in accordance with regulations prescribed by the Secretary) in writing, by registered or certified mail or by personal service, not less than 25 days prior to such sale, to the Secretary.

(E.D. Mich 1999) (citing 26 U.S.C. § 7425's notice requirements and noting that property transfers after the attachment of a lien do not affect the lien); *Nat'l Cent. Bank v. U.S.*, 1977 WL 4333, at * 4 (M.D. Pa. June 8, 1977) (pointing out that joinder will discharge junior federal liens in the § 7425(a) context, while "a specific form of notice in prescribed detail" is required under § 7425(b)).

Therefore, the liens filed on July 31, 2002, December 18, 2002, and February 18, 2003, remain on the assets in Whelco's possession and Whelco's motion to quiet title fails with regard to those assets.

## Conclusion

For the foregoing reasons, I conclude that Whelco has met the requirements to justify the alteration of my previous judgment but that the government's liens still remain on Whitney's assets that Whelco purchased at the receivership sale.

It is, accordingly,

ORDERED THAT

1. Plaintiff's motion to alter or amend judgment be, and the same hereby is granted;

2. Judgment be, and the same hereby is entered in favor of plaintiff Whelco Industries, Ltd. with regard to liens imposed by the government against Whelco Industries, Ltd. as successor to Whitney Electric; and

3. Judgment be, and the same hereby is entered in favor of the defendant United States of America and against the plaintiff Whelco Industries, Ltd. for liens on Whitney property that Whelco subsequently purchased at the receivership sale.

So ordered.

s/James G. Carr  
James G. Carr  
Chief Judge